318

## WEISENBERG v. HAZEN.
### No. 6098.

United States Court of Appeals for the
District of Columbia.

Argued April 3, 1934.

Decided Oct. 1, 1934.

Austin F. Canfield, of Washington, D. C., for appellant.

P. B. Morehouse, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

·PER CURIAM.

This is an appeal from a judgment of the lower court entered upon a directed verdict for the defendant in a case brought by the plaintiff for damages caused, as alleged, by the malpractice of the defendant as his attending physician. The appellant was plaintiff below and the appellee defendant, and they will be referred to as plaintiff and defendant in this opinion.

The testimony tends to show that plaintiff had suffered for more than a year with ringworm infection upon the fingers and under the finger nails of both hands; that he had been treated during that time by a physician other than defendant without substantial improvement; that in April, 1930, he dismissed his former physician and sought treatment by the defendant, who was a physician specializing in dermatology. The defendant treated plaintiff by means of Alpine light rays and mild antiseptics until June 4, 1930, when he decided to remove the finger nail from the little finger of plaintiff's left hand, and this he undertook to do by endothermy; that is, by the application of heat produced by electricity by means of a machine called a "Wappler Portable Teletherm," by which means he intended to sterilize the space beneath the finger nail and to kill the organism in the nail bed underneath. This treatment was administered to plaintiff by defendant on June 4, 1930. The testimony tends to show that this practice was one which is generally approved by medical learning and authority, that the local anæsthetic used in the operation was of standard character, and that the electrical machine thus used was uniformly accepted as efficient by competent physicians.

The testimony tends to prove that within a few hours after the operation the plaintiff suffered severe pains in his finger and that a blister formed upon its upper end, causing him great pain; that the defendant in the meantime had left the city for a short visit elsewhere; that the defendant's nurse treated the blister after communicating with the defendant by long-distance telephone; that after the defendant's return the plaintiff's finger grew steadily worse until finally it became blackened and mummified, and it became necessary to call in a surgeon to amputate it by removing the terminal and half of the intermediate phalanx of the finger, and, accordingly, so much of the finger was clipped away.

It is, of course, plain that the operation performed upon the plaintiff's finger by the defendant was unsuccessful and resulted in serious injury to the plaintiff. The sole question to be decided in the case is whether this miscarriage was caused by the negligence of the defendant when practically performing the operation. It is claimed by the plaintiff that the defendant, who expected to leave the city that afternoon, was hurried in administering the treatment and failed to give the proper time and attention to it when in progress, and subjected the finger to excessive heat, whereby the tissues were burned and destroyed. In support of this contention the plaintiff called as a witness Dr. Shorell, his brother-in-law, a dermatologist, who described the condition of the finger as he saw it nine days after the operation, as follows: "The finger—the small finger of the left hand was

burned and charred from the tip to about one-half way down to the middle portion of the finger, and the balance from the middle portion down to the base of the finger was enlarged, swollen, and puffy. * * * The flesh directly proximal, adjoining the major portion of the finger, was somewhat charred, and the portion below that, the so-called 'healthy flesh,' if you can call it that, was considerably congested and swollen. It was enlarged about twice, I should say, of the normal size, at least twice the normal size." The witness was then asked the following questions and gave the following answers thereto:

"Q. Now, after the dressing was removed and you and Dr. Hazen examined the finger, state whether or not you had a further conversation as to the cause. A. Yes; I did. I said, 'Dr. Hazen, this looks pretty bad. What has happened here?' and he said, 'Doctor, I am awfully sorry, but I have made a terrible mistake.' I said, 'What do you think it is probably due to?' He said, 'Well, by golly, I can't figure it out, but I must have given him a pretty heavy shot.'

"Q. What did you understand him to mean by that? A. I understood that to mean that he had overexposed the finger to the diathermy.

"Q. When you say you understood that to mean that he had overexposed the finger to the diathermy, what relation did that have to the electrical rays? A. Well, yes—

"Q. Or the heat, I mean? A. Well, yes; the diathermy or heat that was used on that finger had burned the finger. Apparently and most obviously a severe burn due to an overexposure.

"Q. In your opinion, was that due to a burn or an infection? A. Oh, absolutely a burn. No infection there at all."

In answer to the hypothetical question put to this witness, he made the following statement: "I would say it was due to an overexposure of the application of heat that should have easily been avoided, and could have been avoided with any degree of care, instead of cooking the finger through and causing it to slough off from the burn; and when the condition that existed was a blister, such as was described, if he would get to it quickly and promptly and not wait two or three days to see it himself, when he knew the kind of treatment he had given, he might have been able to remedy that condition."

The plaintiff was a dentist and testified that his ability to carry on his profession was seriously interfered with by the loss of part of his little finger, and, furthermore, that he had suffered great pain from the operation and for a time had suffered from nervous prostration in consequence of it, but that later he sought the assistance of his own physician who cured both hands by means of Alpine light and ointments.

On the other hand, the testimony of the defendant is to the effect that the heat administered was not excessive and that the attention given by him to the plaintiff throughout was such as would be approved by medical authorities. Defendant denied that he had stated to Dr. Shorell or to any other person that the heat administered to the affected finger was excessive or that it had caused the unexpected result. When called upon to account for the result of the treatment, defendant denied that the finger had been burned and stated that its condition resulted from gangrene. He stated that the gangrene was not caused by heat but would have formed on the plaintiff's little finger irrespective of the application of electrical heat by him on June 4th. He stated "I did not think the electrical heat had a thing to do with it." The following also appeared in defendant's testimony: "I didn't know what the gangrene was from. No one else did." The defendant was asked: "Does ringworm cause gangrene?" He answered: "I have never seen it cause gangrene."

"Q. Did you ever hear of it? A. No." The following also is taken from defendant's testimony:

"Q. Now, at that time you had formed an opinion as to what caused this suspected gangrene? A. Certainly not. Absolutely I suspected the suprarenin may have done it, since the whiteness had not gone out. I never heard of suprarenin at that time—

"Q. We have ruled out the ringworm? A. Yes.

"Q. Well, something must have happened, because of this treatment, that caused the gangrene? A. Something.

"Q. Isn't that a fact? A. I think so. * * *

"Q. What did you think caused it? A. I didn't know what the gangrene was from. No one else did."

In respect to the suggestion appearing above as to suprarenin, it appears that this is a component of novocaine, which was administered as the local anæsthetic at the time of the operation. When asked if the gangrene had resulted from the use of suprarenin and novocaine, he answered: "It is only a

surmise. It is certainly not definite that the suprarenin was the cause of gangrene." Defendant also stated: "However, novocaine with suprarenin in the same proportion is still in use by physicians and surgeons in the District of Columbia, and will continue to be, considering that only one case in a million makes any trouble."

The defendant produced professional witnesses of high standing as dermatologists who testified that the procedure pursued by the defendant in the treatment of the plaintiff was such as was approved by the highest medical authority.

At the close of the testimony for the plaintiff a motion was made by the defendant for a directed verdict. This was denied by the court. After the testimony of the defendant was introduced the motion for a directed verdict was repeated by the defendant, and was sustained by the court. Judgment was entered accordingly, and this appeal was taken.

■ We are of the opinion that the lower court erred in this ruling. It is familiar law that: "Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 233, 74 L. Ed. 720. "When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court." Grand Trunk R. Co. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 683, 36 L. Ed. 485.

In the carefully considered case of Crist v. White, 62 App. D. C. 269, 66 F. (2d) 795, 797, opinion by Mr. Justice Hitz, we said: "And, while the failure of the operation alone creates no presumption of lack of skill or care, it is a circumstance entitled to some consideration, when coupled with the other testimony. As we said in Sweeney v. Erving: 'There are exceptional cases where the result of an operation performed, if unexplained, may warrant an inference of negligence. Thus, evidence showing that after a broken ankle was reset, the ankle was crooked and the ankle joint stiff, tends to prove negligence on the part of the physician in setting the ankle, which evidence should be submitted to the jury.' 35 App. D. C. 62, 43 L. R. A. (N. S.) 734."

We think that the present case presented a question of fact for the jury as to whether or not the defendant was negligent in the treatment of the case and thereby caused plaintiff's injury.

The judgment of the lower court is reversed, with costs, and the cause is remanded for further proceedings not inconsistent herewith.